Lora A. **MILLER** and Cynthia A. Santagata, Appellants–Defendants,

v.

Donald E. **GEELS**, Appellee–Plaintiff.

No. 53A01–9402–CV–49.

Court of Appeals of Indiana, First District.

Nov. 30, 1994.

Transfer Denied March 22, 1995.

John M. Irvine, Student Legal Services, Bloomington, for appellants.

Frank A. Barnhart, Barnhart, Sturgeon & Spencer, Bloomington, for appellee.

NAJAM, Judge.

## STATEMENT OF THE CASE [1]

In this small claims action we apply the Indiana Security Deposits statute, the Bloomington Housing Code,[2] and the com-

---

1. We heard oral argument on June 15, 1994, in Indianapolis.

2. Title 16 of the Bloomington Municipal Code, which concerns "Housing Inspection," contains two chapters, Chapter 16.04 entitled "Housing

mon law of contracts in a landlord-tenant dispute. Lora A. Miller and Cynthia A. Santagata (the "tenants") appeal from the trial court's judgment in favor of Donald E. Geels, their landlord (the "landlord"). The tenants and two other students at Indiana University leased a house in Bloomington from the landlord. After termination of the tenancy and notice to the tenants, the landlord applied the tenants' entire security deposit to unpaid rent, leaving a balance owed for rent and for other damages, including cleaning expenses claimed under the lease. The landlord brought an action in small claims court to recover the unpaid rent, late fees, general cleaning and carpet cleaning expenses, and the cost of replacing the bathroom carpet, and he later amended his complaint on the day of trial to include a request for attorney's fees. The trial court entered judgment for the landlord on all claims, except for the late fees.

We affirm.

### ISSUES

We restate the issues presented on appeal as follows:

1. Whether the section of the Security Deposits statute[3] which limits a landlord's claim against a security deposit to actual damages to the rental unit that are not the result of ordinary wear and tear imposes the same limitation on the landlord's claim for "other damages" to the rental unit in excess of the security deposit.

2. Whether the landlord is precluded from recovering damages for cleaning expenses under the lease because the accumulation of dirt is "ordinary wear and tear."

3. Whether the Bloomington Housing Code, which requires a joint written inspection of the leased premises at the beginning and end of each occupancy, precludes the introduction of evidence of damages to the rental unit when there was no inspection.

4. Whether the landlord is entitled to attorney's fees provided for under the lease

Code" and Chapter 16.12 entitled "Housing Quality." However, for purposes of this opinion we will refer to the provisions at issue collectively as the Bloomington Housing Code.

when he failed to request such fees until the day of trial.

### FACTS

The tenants entered into a one-year lease agreement with the landlord ending on August 14, 1992. The lease was secured by an $840.00 deposit. The lease required the four tenants to "shampoo the carpet" before vacating the premises and to clean certain appliances and other items in the house. The lease also provided that the tenants would leave the rental unit "in the same condition as when received, excluding reasonable wear and tear" and that, if they failed to do so, the tenants would be required to pay the cost of returning the rental unit to its prior condition. Record at 21. Under the lease, the tenants would bear any and all costs, including reasonable attorney's fees, in the enforcement of the lease and would be held jointly and severally liable for any breach of the lease.

In April of 1992, one of the tenants moved out of state and failed to pay her share of the rent for the remainder of the lease. At the end of the lease term, the unpaid rent was $1,050.00. In addition, the landlord incurred expenses of $85.00 for carpet cleaning, $130.00 for general cleaning, and $80.00 for replacement of the bathroom carpet. In February of 1993, the landlord brought a pro se action against the tenants in the Small Claims Division of the Monroe Circuit Court to recover the past due rent, late fees, and the cleaning and replacement expenses. In April of 1993, after Indiana University Student Legal Services entered an appearance on behalf of the tenants, the landlord retained an attorney. The landlord amended his complaint on the day of trial to include a request for attorney's fees. The trial court entered judgment in the amount of $1,805.00 for the landlord and against Miller and Santagata, the only tenants upon whom the landlord could obtain service, as follows:

3. IND.CODE § 32–7–5 *et seq.*

Unpaid Rent ........ $1,050.00
Apartment Cleaning .. 130.00
Bathroom Carpet .... 80.00
Carpet Cleaning ..... 85.00
Attorney's Fees ...... 1,300.00
$2,645.00

Security Deposit ..... <840.00>

Judgment .......... $1,805.00

The court denied the landlord's request for late fees. The tenants appeal. We will state additional facts where necessary.

## DISCUSSION AND DECISION

### Issue One: Security Deposits Statute

The tenants first contend that the Indiana Security Deposits statute places limitations upon the use of a security deposit which apply not only to a landlord's claim against the deposit itself but also to a claim under the lease for "other damages" to the rental unit.[4] Specifically, the tenants assert that a landlord is not entitled to any damages to the rental unit which exceed the amount of the security deposit without proof that such "other damages" constitute "actual damages ... that are not the result of ordinary wear and tear expected in the normal course of habitation of a dwelling." *See* IND.CODE § 32–7–5–13(1). The landlord maintains that the ordinary wear and tear limitation in the statute applies only to a claim against the security deposit.

■ Here, the tenants, who were jointly and severally liable under the lease, were in arrears on their rent in the amount of

$1,050.00 at the end of the lease term. Under Section 13(2) of the statute, the landlord was entitled to withhold the tenants' entire $840.00 security deposit, provided that he met the notice requirements of Sections 12(a)(3) and 14.[5] The tenants do not dispute that the landlord gave the statutory written notice of damages required within the 45 day period for the purpose of applying their security deposit to the unpaid rent. Therefore, the parties agree that the landlord properly applied the $840.00 security deposit in full to the accrued rent, leaving a balance of $210.00 in unpaid rent.

### Other Damages

The landlord's compliance with the statutory notice requirement preserves his right to recover "other damages" to which he is entitled. The Security Deposits statute in Section 12(c) states, "[t]his section does not preclude the landlord or tenant from recovering other damages to which either is entitled." In *Duchon v. Ross* (1992), Ind.App., 599 N.E.2d 621, we discussed Section 12(c) and held:

[Section] 12 does not prevent the landlords from pursuing their claims for "other damages," which could include claims for *amounts in excess of the security deposit* or other types of damages not specified in [Section] 12. However, the clear intent of Section 15 is that if a landlord fails to provide the requisite notice within the 45–day period there are no "other damages" to collect. A landlord can attempt to pur-

---

**4.** Section 12 of the Security Deposits statute summarizes the statute's pertinent provisions and reads as follows:

(a) Upon termination of a rental agreement, all of the security deposit held by the landlord shall be returned to the tenant, except for any amount applied to:
(1) the payment of accrued rent;
(2) the amount of damages that the landlord has or will reasonably suffer by reason of the tenant's noncompliance with law or the rental agreement; and
(3) unpaid utility or sewer charges that the tenant is obligated to pay under the rental agreement;
*all as itemized by the landlord in a written notice* delivered to the tenant together *with the amount due* within forty-five (45) days after termination of the rental agreement and delivery of possession. The landlord is not liable under this sub-

section until supplied by the tenant with a mailing address to which to deliver the notice *and amount* prescribed by this subsection. Unless otherwise agreed, the tenant is not entitled to apply a security deposit to rent.
(b) If the landlord fails to comply with subsection (a), the tenant may recover all of the security deposit due the tenant and reasonable attorney's fees.
(c) This section does not preclude the landlord or tenant from recovering *other damages* to which either is entitled.
(Emphases added).

**5.** We have previously determined that the notice requirements of Sections 12(a)(3) and 14 are to be read harmoniously. *See Raider v. Pea* (1993), Ind.App., 613 N.E.2d 870, 873.

sue a claim for "other damages" only if it returns the tenant's security deposit within 45 days or provides statutory notice.

*Id.* at 625 (emphasis added); *see Skiver v. Brighton Meadows* (1992), Ind.App., 585 N.E.2d 1345, 1347. Thus, where the landlord provides the notice required in order to apply the security deposit to those damages expressly allowed by the statute, the landlord may then also seek to recover any "other damages" to which he is entitled under the lease agreement.[6] Otherwise, if the required notice is not given, the landlord has implicitly agreed that "there are no 'other damages' to collect." *Duchon,* 599 N.E.2d at 625; *see* IND.CODE § 32–7–5–15.

In this case, the landlord complied with the notice requirement and could make a claim for "other damages." The landlord's small claims action to recover "other damages" included expenses he incurred for carpet cleaning, general cleaning and replacement of the bathroom carpet, as well as the balance of unpaid rent and late fees. His claim was based on two sections of the lease which placed specific obligations upon the tenants to clean the premises. Those sections, in pertinent part, provided:

F. When the term of this Lease expires, the Lessee agrees to vacate the premises, leaving them in the same condition as when received, excluding reasonable wear and tear and if not done, agrees to pay the cost of return [sic] the premises to their condition when received.

G. The Lessee understands and agrees that upon vacation of the premises, the range and oven shall be clean, the refrigerator shall be defrosted and open, floors shall be washed and waxed, carpet shall be shampooed, and tub and sinks will be clean. Any necessary cleaning to return the house to the same condition as when the Lessee moved in will be deducted from the security deposit.

Record at 21–22.

■ On appeal, the tenants challenge only whether the landlord was entitled to recover the cleaning expenses he incurred as "other damages" under the lease. They contend that the limitations which the Security Deposits statute places on the use of a deposit also govern a claim for "other damages" and, thus, do not permit a landlord to recover under the "restoration standard" for determining damages to the rental unit.[7] The tenants maintain that the restoration provision in the lease, which requires them to clean the leased premises, unlawfully shifts the landlord's duties under the statute to the tenant.[8] In effect, the tenants would have us hold that the Security Deposits statute prohibits the parties from entering into a private agreement concerning the obligation to clean

---

**6.** The tenants contend, however, that while the written notice was timely, the notice provided by the landlord as to the cleaning and carpet replacement expenses was deficient. They assert that because the notice provided only estimates of the cost, and not actual receipts, it was insufficient to meet the requirements of the Security Deposits statute. The tenants are mistaken. First, the statute does not require any notice at all of the amount of "other damages" the landlord may seek. Second, even when the landlord is required to provide notice of the amount of damages, the statute requires only that he state the "estimated cost of repair." *See* IND.CODE § 32–7–5–14. There is no requirement in the statute that the landlord provide actual receipts with the notice. Thus, we disagree with the tenants and conclude that the notice was sufficient.

**7.** The restoration standard refers to a commonplace provision in residential leases which·requires a tenant, at the end of the lease term, to leave the rental unit in the same condition as it

was when the tenant took possession, excluding ordinary wear and tear. The lease at issue here contained a similar provision.

**8.** The tenants' argument is premised on the language of Section 17 of the Security Deposits statute, which states: "[a] waiver of this chapter by a landlord or tenant, by contract or otherwise, is void." The tenants maintain that if the statutory definition of "actual damages" does not also apply to those damages which exceed the security deposit, then the statute's purpose would be undermined. They insist that Section 17's proscription against "waiver" of the statute was intended to restrict the freedom of the parties to contract for "other damages" and to limit the recovery of "actual damages" under a residential lease agreement to those "that are not the result of ordinary wear and tear expected in the normal course of habitation of a dwelling." However, we believe that Section 17 is intended only to prohibit a waiver of the statute's requirements at the *inception* of a lease agreement, as a condition of the tenants' occupancy.

the leased premises because the legislature has determined that "ordinary wear and tear" includes the accumulation of dirt which must be removed in order to prepare the premises for future occupancy. We cannot agree with the tenants' interpretation.

The Security Deposits statute applies only to security deposits. It is a basic rule of construction that statutes in derogation of the common law are to be strictly construed. *Logestan v. Hartford Steam Boiler Inspection & Ins. Co.* (1993), Ind.App., 626 N.E.2d 829, 832, *trans. denied.* "We will assume that the legislature is aware of the common law and intends to make no change therein beyond its declaration either by express terms or unmistakable implication." *Id.* (quoting *Hinshaw v. Board of Commissioners of Jay County* (1993), Ind., 611 N.E.2d 637, 639). It was the intent of the legislature to provide special protection for security deposits, which often give rise to landlord-tenant disputes. The statute clearly and unambiguously preserves the right of the landlord or tenant to recover other damages to which either is entitled. IND.CODE § 32–7–5–12(c). It was not the legislature's intent to limit the freedom of landlords and tenants to contractually define "other damages," including the obligation to clean the premises. Thus, we decline to extend the reach of the statute beyond the security deposit.

### Issue Two: Ordinary Wear and Tear

The tenants next assert that even if the Security Deposits statute does not govern a claim for "other damages" under a lease provision, the lease at issue here is ambiguous concerning whether the landlord may recover cleaning expenses. In examining sections F and G of the lease, the tenants contend that section F correctly precludes the landlord from recovering cleaning expenses as damages because it excludes a claim for "reasonable wear and tear," but that section G then purports to make the tenants responsible for "any necessary cleaning" to return the premises to the same condition as when the tenants took possession. The tenants argue that the "obligation to clean" provision in the lease is inconsistent with the provision which excludes recovery for ordinary wear and tear. Therefore, based on this alleged inconsistency, the tenants reason that the accumulation of dirt must be ordinary wear and tear if the two sections are to be construed harmoniously.

The oft-used phrase "ordinary wear and tear" has not been defined by an Indiana court and its meaning is not found in our statutes. However, the Washington Supreme Court has held that the concept of "ordinary wear and tear" applies to situations of "gradual deterioration resulting from use, lapse of time, and to a certain extent to the operation of the elements." *Publishers Bldg. Co. v. Miller* (1946), 25 Wash.2d 927, 172 P.2d 489, 496. Further, a United States District Court in Pennsylvania has determined that, in their "everyday common usage," the words "wear and tear" mean "that ordinary and natural deterioration or abrasion which an object experiences by its expected contacts between its component parts and outside objects during the period of its natural life expectancy." *Cyclops Corp. v. Home Ins. Co.* (W.D.Pa.1973), 352 F.Supp. 931, 936. The *Cyclops* court also found that the modifier "ordinary" did not add anything to the meaning of "wear and tear." *Id.* Finally, in *United States Gypsum Co. v. Schiavo Bros., Inc.* (E.D.Pa.1978), 450 F.Supp. 1291, another federal court in Pennsylvania has held that in determining whether "wear and tear" was reasonable or ordinary, a court must consider "the use to which the property was put." *Id.* at 1305.

From the foregoing authorities, we conclude that ordinary wear and tear refers to the gradual deterioration of the condition of an object which results from its appropriate use over time. We do not agree with the tenants' contention that the accumulation of dirt constitutes ordinary wear and tear. Objects which have accumulated dirt and which require cleaning have not gradually deteriorated due to wear and tear. Rather, such objects have been damaged by dirt, although they are usually capable of being returned to a clean condition.[9]

9. We disagree with the holding in *Smolen v. Dahlmann Apartments, Ltd.* (1983), 127 Mich.

In short, the accumulation of dirt in itself is not ordinary wear and tear. Therefore, we hold that a rental unit which tenants are required to clean under a lease agreement but which the tenants have failed to clean has been damaged. In the present case, sections F and G of the lease are not inconsistent or ambiguous but can easily be reconciled and construed harmoniously. The landlord may pursue a claim for cleaning expenses under the lease.

### Issue Three: Bloomington Housing Code

■ The tenants also contend that the landlord is in violation of the Bloomington Housing Code's requirement that a joint written inspection be completed by the landlord both at the time of the tenants' initial occupancy and at the end of the lease term. They insist that the landlord must first satisfy the Code's inspection requirement, which places a duty on the landlord to document the condition of the rental unit, before the landlord can introduce any evidence at trial of damage sustained to the rental unit.[10]

■ We have previously addressed the Bloomington Housing Code's effect on residential lease agreements. In . *Breezewood*

App. 108, 338 N.W.2d 892, a Michigan Court of Appeals decision emphasized by the tenants, wherein the court held that "premises requiring cleaning have not, as such, suffered damages." *Id.*, 338 N.W.2d at 895. Admittedly, a dirty wall or a grimy kitchen is not the same as a torn carpet or a hole in the wall. Nevertheless, in order to prepare the leased premises for occupancy by future tenants, most residential leases require tenants upon vacating to clean the rental unit in order to restore it to its prior condition. Where the tenants fail to meet their obligation under the lease agreement to clean the rental unit, the landlord must incur the expense of doing so and is thereby damaged.

10. The Bloomington Housing Code provides in pertinent part:

(a) *The owner or his agent shall contact the tenant and arrange a joint inspection of the premises to occur within ten days of the tenant's occupancy of the rental unit.* The owner or his agent and the tenant shall at that time jointly complete an inventory and damage list, and this shall be signed by all parties to the tenancy agreement. Duplicate copies of the inventory and damage list shall be retained by all parties and shall be deemed a part of the tenancy agreement.

(b) *The owner or his agent shall contact the tenant and arrange a joint inspection of the prem-*

*Management v. Maltbie* (1980), Ind.App., 411 N.E.2d 670, *trans. denied,* another landlord-tenant case, we stated that "[t]he Bloomington Housing Code was in effect at the time of the lease agreement and, by law, was incorporated into it, following the rule set forth by the Indiana Supreme Court in *Lutz v. New Albany City Plan Commission* (1951), 230 Ind. 74, 83, 101 N.E.2d 187." *Id.* at 675. Indeed, it is well settled that, unless the contract provides otherwise, all applicable law in force at the time the agreement is made impliedly forms a part of the agreement without any statement to that effect. *Ethyl Corp. v. Forcum–Lannom Assoc's.* (1982), Ind.App., 433 N.E.2d 1214, 1220, *trans. denied.* A city ordinance comes within that rule. *Dollman v. Pauley* (1931), 202 Ind. 387, 394, 174 N.E. 729, 731; *accord Lutz,* 230 Ind. at 83, 101 N.E.2d at 191. As a matter of law, the Bloomington Housing Code's requirement that the landlord initiate and perform a joint written inspection is incorporated into the terms of the lease between the landlord and the tenants in this case. Thus, the landlord has impliedly agreed to comply with that requirement.

*ises to occur at the end of the tenant's occupancy and prior to the occupancy of the next tenant.* Any damages to the rental unit shall be noted on the inventory and damage list, and the list shall thereupon be signed by the parties. If the parties can agree to the cost of repair, such portion as is due the tenant, shall be refunded within forty-five days.

(c)(1) *The owner or his agent shall have a duty to initiate the joint inspections;* however, both the owner or his agent and the tenant shall have an affirmative duty to make a good-faith effort in scheduling joint inspections. In the event an owner or his agent is unable to schedule an inspection with the tenant through contacting the tenant by telephone, personal message or personal contact, the owner or his agent may show compliance with this section by producing the following: a carbon copy of a letter to tenant stating the time and place of inspection; and, a normal business record showing that this letter was mailed to the tenant by first class mail at least two days prior to the date of the inspection.

(c)(2) If the owner or owner's agent cannot arrange a joint inspection pursuant to the above procedures, *the owner or agent shall complete the inspection,* noting on a signed and dated inspection report any damages which exceed normal wear and tear.

BLOOMINGTON, IN., MUNICIPAL CODE tit. 16, § 16.12.040 (emphases added).

The record shows that the landlord did not perform a joint written inspection with the tenants. Rather, the landlord and one tenant conducted a "walk through inspection at the time the tenants entered into the lease," but no written record was made. Record at 38 and 40. Neither was a joint written inspection completed at the end of the lease term. At trial, the landlord asserted that he was not obligated to perform such inspections because section B of the lease agreement provided that the tenants, not the landlord, had the obligation to document the condition of the rental unit at the inception of the lease.

However, as we have previously stated, at both the inception and conclusion of the lease term, the landlord had a duty to comply with the joint written inspection provisions imposed by the Housing Code and incorporated by law into the lease. The Housing Code creates private contract rights for both landlords and tenants and, as the City notes in its Summary of Tenants' and Owners' Rights and Responsibilities,[11] the rights protected by the Code cannot be waived by the lease. Any lease provision which purports to exclude or modify the inspection procedures created by the Code is void. *See Meehan v. Meehan* (1981), Ind., 425 N.E.2d 157, 160 ("parties to an agreement cannot enforce terms which contravene statutory law"). The provision in the instant lease which attempted to shift the responsibility to perform an inspection to the tenants was unenforceable.

Nevertheless, a landlord's compliance with the inspection requirement in the lease does not operate as a condition precedent to a suit against his tenants for damages. In *City of Bloomington v. Chuckney* (1975), 165 Ind.App. 177, 331 N.E.2d 780, *trans. denied*, we considered whether parts of the original version of the Housing Code adopted by the Bloomington Common Coun-cil in 1972 were invalid as beyond the scope of the City's municipal powers. There, we affirmed the Monroe Circuit Court's ruling which invalidated a number of provisions in the Code because "in each instance there was an attempt to govern a 'private or civil relationship', an activity proscribed by IC 1971, 18–1–1.5–19."[12] *Id.* at 182, 331 N.E.2d at 784. However, this court also affirmed the trial court's judgment that other sections of the original Housing Code were valid as "incident to the exercise of an independent municipal power," including the requirement that a joint written inspection be conducted and an inventory and damage list be prepared. *Id.* at 182, 331 N.E.2d at 783.

On appeal, the *Chuckney* decision further stated:

We are of the opinion that portions of Ordinance 72–76 so directly affect the landlord-tenant relationship that they cannot be upheld as an incident to the exercise of an independent municipal power.

The Ordinance goes so far as to dictate specific terms which must be included in every residential lease agreement entered into within the City of Bloomington. Many of these terms are wholly unrelated to city housing and safety codes and cannot, therefore, be incident to the city police powers in those areas.

*Id.* Thus, while we held the inspection requirement valid, we struck down a provision of the ordinance which attempted to create an evidentiary presumption upon the landlord's failure to perform a joint written inspection, and to supply and execute an inventory and damage list, as an impermissible attempt to govern a private or civil relationship. *Id.* at 182, 331 N.E.2d at 783–84.

Together, the *Breezewood* and *Chuckney* decisions mean that while the Housing Code is incorporated into the lease by operation of law, the Code provisions are

---

**11.** Under the Bloomington Housing Code, Section 16.12.050(d), the landlord must provide "to each tenant, at or before the commencement of occupancy," a copy of a summary of tenants' and owners' rights and responsibilities, promulgated by the City of Bloomington's Housing Code Enforcement Officer. In addition, the summary must be signed by all parties to the lease and retained by the landlord with the joint inventory and damage list. In this case, the landlord and tenants signed the summary as provided in the Housing Code. Record at 138.

**12.** Indiana Code § 18–1–1.5–19 was repealed by Indiana Code § 36–1–3–8.

to be construed like the other provisions of the lease, and the Code cannot dictate the legal effect of the landlord's failure to conduct an inspection. The ordinance provision here does not declare, nor could it, that non-compliance with the inspection provisions precludes the admission of evidence on the landlord's claim for damages to the rental unit.

We decline to construe the ordinance in every instance as a bar to the landlord's introduction of evidence of damages sustained to a rental unit during the tenancy when the landlord fails to perform a joint written inspection. Just as the ordinance cannot create an evidentiary presumption, *see id.* at 183, 331 N.E.2d at 783, neither does the lack of a Code inspection in this case necessarily preclude the introduction of relevant evidence on such damages.

### Contract Defenses

As we have noted above, the Bloomington Housing Code's joint inspection requirement does not enjoy a favored status among lease terms. In other words, the enforcement of the Code's inspection provisions is subject to the same common law defenses usually available in a breach of contract action arising from the conduct of the parties. These defenses include, by way of illustration, waiver, estoppel, subsequent written or oral modification, compromise, settlement, accord and satisfaction and impossibility of performance. Just as parties are free to impose new duties upon each other by agreement, in the absence of legislation to the contrary, they are also generally free to modify existing duties that they owe each other as a matter of law. *See* Restatement (Second) of Contracts § 192 Introductory Note (1979).

The Summary of Tenants' and Owners' Rights and Responsibilities informs the tenant of his rights and interprets the Code to mean that if an owner does not initiate a joint inspection, the tenant *should* request one, and that if an owner does not respond, then the tenant *may* execute his own inspection report and send a copy to the owner. This procedure furthers the City of Bloomington's interest in inspections and facilitates the proper disposition of the damage deposit.

A person with full knowledge of the facts and aware of his rights who nevertheless stands by and acquiesces in conduct inconsistent with those rights may be estopped from subsequently asserting those rights. *See City of Hammond v. Welsh* (1946), 224 Ind. 349, 67 N.E.2d 390, 393; *Henning v. Neisz* (1971), 148 Ind.App. 576, 268 N.E.2d 310, 316. Thus, a party who accepts defective performance of a lease may, by reason of estoppel, acquiescence or ratification, be prevented from claiming that the lease is defective. *See Waxman Industries, Inc. v. Trustco Development Co.* (1983), Ind. App., 455 N.E.2d 376, 378.

The tenants in the present case failed to assert their right to a joint inspection, and the landlord relied on their acquiescence and implied consent to no inspection. The informed tenant who takes possession, occupies and enjoys the use of the rental unit for the lease term and elects not to invoke his right to an inspection, is estopped after termination of the tenancy to plead the lack of an inspection as a bar to the landlord's introduction of physical damage evidence. Under such circumstances, the tenant has elected to accept and utilize the premises and, hence, to discharge the landlord's breach of the inspection requirement.

Further, the evidence shows that here the tenants not only failed to invoke their right to a move-out inspection but struck a compromise with the landlord. Miller telephoned the landlord in early July from Virginia to discuss the unpaid rent and cleaning of the rental unit at the end of the lease term in August. The tenants had planned to have their sub-tenants clean the premises before vacating in August. Miller testified that she "called [the landlord] to tell him that we were planning to take [care] of this" because she "knew that in the lease agreement it stated that the house needed to be cleaned and the carpets needed to be shampooed." Record at 109 and 118. However, the landlord informed Miller that he usually hires someone to clean the premises professionally rather than having the tenants perform the cleaning themselves. Miller then requested that the landlord provide her with an estimate of the

cleaning charges, to which the landlord replied that it would be "no more than three hundred dollars." Record at 109.

Miller subsequently contacted Santagata and another tenant and informed them of the cleaning agreement reached with the landlord. Thereafter, both of those tenants wrote separate letters to the landlord in late July or August of 1992 and authorized him to deduct $75.00 each from the security deposit for "cleaning." Record at 139–40. Miller testified at trial that she had not intended to return to clean the rental unit "because he [the landlord] was going to clean it and I was going to be charged for it." Record at 118. In addition, Miller stated that although she would have preferred to arrange for the sub-tenants to clean the rental unit, she understood that the landlord wanted it done professionally and she relayed that information to the other tenants. Thus, the evidence supports the conclusion that the tenants agreed to the landlord's estimate that the damages for cleaning expenses would not exceed $300.00 and that they expected him to charge those expenses against the security deposit. This agreement was reached, at least in part as a matter of convenience, when one tenant was in New Jersey, one was in Massachusetts, another was in Virginia and the fourth tenant could not be located.

Accordingly, because the tenants expressly authorized the landlord to deduct their share of the cleaning expenses from the security deposit, knowing that a joint written inspection had not been performed, they were estopped from repudiating that authorization and attempting to hold the landlord to his obligation under the lease to perform such an inspection. Likewise, the record shows that Miller in effect relinquished her right to a joint written inspection when she agreed upon the amount of damages to be assessed for damage to the rental unit at the end of the lease term. Miller contacted the landlord to make arrangements for cleaning the rental unit because none of the tenants was

planning to return to Bloomington. Although she may not have been completely satisfied with the compromise she and the landlord reached, Miller relayed their agreement to her co-tenants who in turn agreed in writing to the landlord's compromise of $300.00 for cleaning. In this manner, the parties adjusted their contract rights and obligations.

We hold that the Bloomington Housing Code's joint written inspection requirement places an obligation upon the landlord, as a term of the lease, to document the condition of the premises at the beginning and end of the tenants' occupancy.[13] While tenants may normally invoke the inspection requirement, the tenants in the present case did not. Rather, the tenants decided to forego the joint written inspection and agreed to the landlord's own estimate of damages. The tenants appeal from a general judgment, and we will affirm a general judgment on any legal theory supported by the evidence. See Estate of Hann v. Hann (1993), Ind.App., 614 N.E.2d 973, 977. We conclude that the tenants are estopped from repudiating their agreement.

### Issue Four: Attorney's Fees

 Finally, the tenants contend that the trial court erred when it allowed the landlord orally to amend his complaint at trial to include attorney's fees because the landlord waived his right to attorney's fees when he failed to make a request for such fees prior to trial. Specifically, the tenants assert that the landlord is required under the Small Claims Rules to plead the amount of his claim, including any amount for attorney's fees, when the complaint is filed. The landlord responds that he is entitled to attorney's fees because the lease so provided and because he pled attorney's fees in the principal suit by oral amendment. We agree with the landlord.

This action was brought by the landlord pro se in small claims court. It was not until

---

13. The term "occupancy" as used in the ordinance does not mean actual physical occupancy but means the tenant's right to possession. An inspection is required at the beginning and at the end of the tenant's occupancy, and for that purpose a tenant's occupancy is coextensive with the

tenant's right to possession under the lease. Contrary to the tenants' interpretation of the Housing Code, neither a sub-lease nor an assignment of lease which does not expressly release the original tenant as an obligor requires a mid-term inspection.

after the tenants sought representation by Student Legal Services that the landlord retained counsel, who then entered an appearance nearly seven months before the trial commenced. At the outset of trial, counsel asked for "leave of the court to amend the complaint to include the request for reasonable attorney fees as provided in the contract." Record at 36. Section N of the lease agreement provides in part that "the Lessee agrees to bear any and all costs, *including reasonable attorneys' fees,* in the enforcement of this lease." Record at 135 (emphasis added). While the tenants stipulated that the amount of attorney's fees requested was reasonable, they objected that attorney's fees could be awarded pursuant to an oral amendment to the complaint made at trial.

In awarding attorney's fees in the amount of $1,300.00 to the landlord, the trial court found the following:

> There is no real issue of surprise to defendants from plaintiff's request for attorney's fees on the day of trial, as plaintiff's attorney entered an appearance in this cause on April 6, 1993, and substantial legal work was done by both sides in this case. The Lease that forms the basis of the Plaintiff's action in this case provides for attorney's fees, and they are routinely requested in lease actions such as this, so defendant's reliance on the case *Caltram Equipment Co., Inc. v. Rowe* (1982), Ind.App. 441 N.E.2d 46 is not justified. The only real question about attorney's fees is whether or not plaintiff is entitled to them, and the lease so provides.

The trial court did not err. ·

Small Claims Rule 2(B)(4) provides that the plaintiff's notice of a claim "shall contain ... a brief statement of *the nature and amount* of the claim." (Emphasis added). Further, as the tenants correctly assert, "[t]here is no Small Claims Rule which authorizes an attorney to amend a complaint once trial has commenced...." *See* Brief of Appellant at 28. However, where the Small Claims rules are silent, our courts have applied the Trial Rules. *Frank H. Monroe Heating & Cooling v. Rider* (1983), Ind.App., 450 N.E.2d 1056, 1057. "The Trial Rules govern Small Claims proceedings, but only to

the extent that they are not inconsistent with the Small Claims Rules." *Id.*

Indiana Trial Rule 15(A) provides that when time has passed to amend a pleading "as a matter of course ... a party may amend his pleadings only by leave of court or by written consent of the adverse party; and leave shall be given when justice so requires." We have previously stated that, "the policy in this state is liberally to allow the amendment of pleadings, and leave to amend should be given unless the amendment will result in prejudice to the opposing party." *Criss v. Bitzegaio* (1981), Ind., 420 N.E.2d 1221, 1223. In addition, a trial court generally has broad discretion to grant or deny a party leave to amend his complaint, and we will reverse the trial court's decision on this matter only if it constitutes a clear and prejudicial abuse of discretion. *Id.*

Further, this is an action in small claims court. On appeal, we defer to the trial court's discretion, mindful that the Small Claims Rules are intended to provide a judicial resolution of a claim without the expense and procedural formality of typical civil litigation. *See* S.C.R. 6; *Potts v. Castillo* (1984), Ind.App., 460 N.E.2d 996, 998, *trans. denied.* Indeed, the hallmarks of small claims court are informality and expedience. Small Claims Rule 8(A) provides in pertinent part: "The trial shall be informal, with the sole objective of dispensing speedy justice between the parties according to the rules of substantive law, and shall not be bound by statutory provisions or rules of practice, procedure, ·pleadings or evidence...." S.C.R. 8(A); *see Marshall v. Hatfield* (1994), Ind. App., 631 N.E.2d 490, 493.

Here, the landlord amended his complaint at the outset of trial to include a request for attorney's fees, and the trial court granted his motion. The court found that there was "no real issue of surprise" to the tenants because the lease agreement expressly provided for the recovery of attorney's fees and the tenants were aware that the landlord's counsel had done substantial work in the matter. Moreover, much of the work required to be performed by landlord's counsel was in response to correspondence, discovery requests and pleadings initiated by counsel

for the tenants. Therefore, we hold that the trial court did not abuse its discretion when it granted the landlord leave to amend his complaint to include a request for attorney's fees.

The judgment of the trial court is affirmed.

SHARPNACK, C.J., and BAKER, J., concur.